**BILLY J. WILLIAMS, OSB #901366**
United States Attorney
District of Oregon
**ALEXIS A. LIEN, OSB #110569**
alexis.lien@usdoj.gov
Assistant United States Attorney
1000 SW Third Ave., Suite 600
Portland, Oregon  97204-2902
Telephone: (503) 727-1000
Attorneys for the United States of America

<br>

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | **3:19-cv-00249-MA** |
| **Plaintiff,** | |
| **v.** | **COMPLAINT,** *in rem*, **FOR FORFEITURE** |
| **$273,990.00 IN UNITED STATES CURRENCY,** *in rem*, | |
| **Defendant.** | |

Plaintiff, United States of America, by Billy J. Williams, United States Attorney for the

District of Oregon, and Alexis A. Lien, Assistant United States Attorney, for its Complaint *in rem*

for forfeiture, alleges:

I.

This Court has subject matter jurisdiction, *in rem* jurisdiction, and venue pursuant to

21 U.S.C. § 881; 28 U.S.C. §§ 1345, 1355, 1356, and 1395; and 19 U.S.C. § 1610.

**Complaint** *in rem* **for Forfeiture**                                                                 **Page 1**

II.

Defendant, *in rem*, $273,990.00 in United States currency, was seized in the District of Oregon, and is now and during the pendency of this action will be within the jurisdiction of this Court.

III.

Defendant, *in rem*, $273,990.00 in United States currency, represents proceeds traceable to an exchange for controlled substances or was used or intended to be used to facilitate such a transaction in violation of 21 U.S.C. § 801, *et. seq.*, and is forfeitable to the United States pursuant to the provisions of 21 U.S.C. § 881(a)(6), as more particularly set forth in the Declaration of Task Force Officer Christopher Devlin, Homeland Security Investigations, marked as Exhibit A, attached and fully incorporated herein by this reference.

WHEREFORE, Plaintiff, United States of America, prays that due process issue to enforce the forfeiture of Defendant, *in rem*, $273,990.00 in United States currency, that due notice be given to all interested persons to appear and show cause why forfeiture of this Defendant, *in rem*, should not be decreed; that due proceedings be had thereon; that this Defendant be forfeited to the United States; and that Plaintiff United States of America be awarded its costs and disbursements incurred in this action.

DATED: **February 19, 2019**              Respectfully submitted,

BILLY J. WILLIAMS
United States Attorney

*s/ Alexis A. Lien*
**ALEXIS A. LIEN**
Assistant United States Attorney

**Complaint *in rem* for Forfeiture**                                              **Page 2**

**VERIFICATION**

I, CHRISTOPHER DEVLIN, declare, under penalty of perjury, pursuant to the provisions of 28 U.S.C. Section 1746, that I am a Task Force Officer with Homeland Security Investigations, and that the foregoing Complaint *in rem* for Forfeiture is made on the basis of information officially furnished and upon the basis of such information the Complaint *in rem* for Forfeiture is true as I verily believe.


_s/ Christopher Devlin_
CHRISTOPHER DEVLIN
Task Force Officer
Homeland Security Investigations


**Complaint *in rem* for Forfeiture**                                              **Page 3**

## DECLARATION OF CHRISTOPHER DEVLIN

I, Christopher Devlin, do hereby declare:

## PURPOSE OF DECLARATION

1.    This declaration is submitted in support of a complaint for forfeiture.   The information contained in this declaration is based on an investigation I conducted, which will show that $273,990.00 in U.S. currency seized from Michael Simon and Simon Rijo at the Portland Amtrak Station is subject to forfeiture pursuant to 21 U.S.C. § 881(a)(6), as moneys furnished or intended to be furnished by any person in exchange for a controlled substance, proceeds traceable to such an exchange, or moneys used or intended to be used to facilitate violations of 21 U.S.C. § 801, *et. seq.*   The facts set forth in this declaration are based on my own personal knowledge; knowledge obtained from other individuals during my participation in this investigation, including other law enforcement officers; interviews of witnesses; my review of records related to this investigation; communications with others who have knowledge of the events and circumstances described herein; and information gained through my training and experience.   This declaration does not set forth each and every fact that I or others have learned during the course of this investigation, only those necessary to establish probable cause to believe the seized currency is subject to forfeiture pursuant to 21 U.S.C. § 881(a)(6).

## OFFICER BACKGROUND AND TRAINING

2.    I am a police officer with the City of Portland Bureau of Police and have been employed as a police officer since November 29, 2001.   I am currently assigned as an Investigator with the Drugs and Vice Division (DVD).   My duties include but are not limited to the investigation of violations of the Oregon Uniform Controlled Substances Act (Oregon Revised Statutes 475.752, 475.860, 475.864, 475.856, and 475.858).

**Declaration of Christopher Devlin**                                    **EXHIBIT A    Page 1**

3.     Since March of 2008, I have been cross designated by Homeland Security Investigations (HSI) as a Task Force Officer (TFO) and assigned to the High Intensity Drug Trafficking Area Interdiction Taskforce (HIT).   The primary responsibility for the HIT team is the interdiction of narcotics and drug proceeds transported by couriers through the Portland International Airport, Amtrak train stations, various interstate bus lines, and the highways and byways through the Portland Metropolitan area. The HIT team is also responsible for the interdiction of narcotics and drug proceeds carried through common couriers, such as FedEx, UPS, USPS, DHL and other parcel and delivery companies.   As a TFO, I have been authorized by Rule 41 of the Federal Rules of Criminal Procedure to enforce federal criminal law, and therefore I am authorized by law to conduct investigations and make arrests for felony offenses.

4.     My training and experience consists of attending a six-month Basic Police Academy administered by the Oregon Police Corps.  I was then hired by the Portland Police Bureau and completed an eight week Advanced Officers Academy administered by the Portland Police Bureau.  I have received training from the Multnomah County District Attorney's office and the Portland Police Bureau regarding narcotics investigations and search and seizure.  I received training in the recognition and identification of controlled substances.  I have received numerous hours of training from the Oregon Narcotics Enforcement Association (ONEA), of which I am a member.  I have attended a forty (40) hour Clandestine Laboratory certification school administered by Network Environmental Services.   I have also attended a sixteen (16) hour marijuana cultivation course administered by the Royal Canadian Mounted Police (RCMP).  I have attended an eighty (80) hour Basic Narcotics Investigator Course administered by the Drug Enforcement Administration (DEA).  I have attended and completed twenty four (24) hours of training on narcotics interdiction put on by the International Narcotics Interdiction Association

**Declaration of Christopher Devlin**                                  **EXHIBIT A    Page 2**

(INIA) in San Diego, California, which included specific training on parcel interdiction.  I have received training in the laws and procedures regarding working with confidential reliable informants.  During the course of my duties I have made more than three hundred (300) arrests for controlled substance violations and have assisted in the execution of at least twenty (20) controlled substance search warrants.

## BACKGROUND ON NARCOTICS PROCEEDS
## TRANSPORTED THROUGH TRAIN STATIONS

5.      I know from my training and experience that drug traffickers transporting narcotics proceeds will frequently use Amtrak to transport proceeds to a source city in order to purchase controlled substances, including marijuana, cocaine, heroin and methamphetamine.  I know from my training and experience that subjects trafficking narcotics proceeds often use Amtrak to transport proceeds because of their ability to maintain custody of the proceeds and the absence of the Transportation Security Administration (TSA) security screening checkpoints at most Amtrak stations, which aids in the low detection rate by law enforcement. I know from my personal experience, training and discussions with other law enforcement officers that these controlled substances and proceeds of the illegal sale of controlled substances are often found during train interdictions at the Amtrak Station in Portland, Oregon.

6.      Based on my experience, training, and discussions with other law enforcement officers experienced in drug investigations, I know Oregon is a marijuana source state for destination locations across the United States.  Current Oregon state laws permitting the recreational and medical growth, purchase, and possession of marijuana provide individuals with significant quantities of marijuana, which can be illegally shipped to other states where marijuana is illegal or less available in order to derive substantially increased profits.

**Declaration of Christopher Devlin**                              **EXHIBIT A    Page 3**

7.      Based on my experience, training and discussions with other law enforcement officers experienced in drug investigations, I know that certain indicators exist when drug traffickers book Amtrak travel for the purpose of purchasing narcotics. These travel indicators are inconsistent with normal travel and would only be justified under extraordinary circumstances.

8.      I know from my training and experience that drug traffickers will book their Amtrak travel the same day or several days before their travel. This is often done because the availability of narcotics and narcotics proceeds changes on short notice. Drug traffickers have narrow windows to conduct drug transactions when a source of supply obtains narcotics. Otherwise the source will find another buyer.

9.      I know from my training and experience that drug traffickers will book one-way travel or have short turn around trips. This is commonly done because drug traffickers are delivering narcotics proceeds to their source of supply (and do not require a lot of time at their destination) or the drug trafficker is planning on transporting the purchased narcotics by car/train back to their originating city.

10.      I know from my training and experience that, when contacted by law enforcement, drug traffickers carrying narcotics proceeds will be deceptive about the amount of currency they are carrying.  Drug traffickers usually underestimate or are evasive about the quantity of the currency they are carrying because they are aware law enforcement can seize narcotics proceeds.  Drug traffickers usually believe that if they are in possession of a lesser amount of currency that it is less likely to be seized by law enforcement.  It is common for drug traffickers carrying narcotics proceeds to change their statements regarding the amount of currency that they are carrying several times.

**Declaration of Christopher Devlin**                                   **EXHIBIT A     Page 4**

## SUMMARY OF INVESTIGATION

11.     On May 15, 2018, Portland Police Officers and HSI TFOs assigned to the HIT team in Portland, Oregon were working an interdiction detail at the Amtrak train station located on 6th Avenue in Portland, Oregon.

12.     Specifically, law enforcement officers were working Amtrak Train 27, which originates from Chicago, Illinois and terminates in Portland, Oregon.  I know that this route is known by law enforcement as one that is commonly used by individuals who transport drugs and/or drug proceeds.  I personally have been involved in over 100 investigations involving the transportation of narcotics and/or narcotic proceeds using this route.

13.     While passengers were exiting the train, HIT investigators, including myself, were outside between the train and the entrance to the train station observing.  HIT investigators contacted several individuals who were walking past our location.   After identifying ourselves as law enforcement, HIT investigators requested permission for a narcotics-detection canine to sniff the individuals' bags.  After contacting these passengers, HIT investigators and the narcotics-detection canine entered the Amtrak Station.

14.     Approximately five minutes after the last person was observed exiting Amtrak Train 27, I observed through the east rear windows of the Amtrak Station two more passengers walk from the train and enter the Amtrak Station.  I ascertained that these individuals, who had bags, had come from the Amtrak Train 27, as Amtrak is private property with its own paid security and due to safety concerns only individuals exiting the train would be able to enter the building. The men were later identified as Michael SIMON and Steven RIJO.

15.     In my experience and from past observations, this delay in exiting the train was unusual compared to what I know to be the normal time for passengers to exit the train on this

route.   Furthermore, the delay appeared to me to coincide with the HIT members and their narcotics-detection canine's departure from the outside area into the Amtrak Station.

16.     Because of this unusual delay in disembarking the train, I contacted SIMON and RIJO inside the Amtrak Station and introduced myself by displaying my police identification and telling them I was a Police Officer.   During my contact with them, I continued to walk with them and was careful not to block their path.   I asked for consent to have a properly trained narcotics-detection canine sniff their three bags, to which SIMON and RIJO consented.   SIMON had one duffle bag, and RIJO had one duffle bag and a back-pack.

17.     I was informed by Portland Police Bureau Officer Groshong that his narcotics-detection canine "Rex" positively alerted to the presence of narcotic odor emanating from all three bags.

18.     I requested and received consent from SIMON to hand search his duffle bag.   TFO Castaneda, who was standing in the lobby of the Amtrak Station, assisted me by conducting the search.   As TFO Castaneda was hand searching SIMON's duffle bag, I requested and received consent from RIJO to hand search both of his bags.   HSI TFO/Portland Police Bureau Sergeant Kenagy arrived while I was speaking with both SIMON and RIJO.   TFO/Sgt. Kenagy assisted me by conducting a search of RIJO's two bags.

19.     During the search, TFO Castaneda located a large quantity of U.S. currency inside SIMON's duffle bag.   TFO Castaneda asked SIMON how much currency he was traveling with, and SIMON replied that he had over $100,000.00.   TFO Castaneda observed that a portion of the money found in SIMON's bag was wrapped in money bands, but the currency did not appear to be banded in a manner consistent with that of U.S. currency banded from a bank.   Rather, the

**Declaration of Christopher Devlin**                                      **EXHIBIT A     Page 6**

bands appeared to have been store-purchased, as they did not display a stamp from a financial institution.

20.    TFO/Sgt. Kenagy also found a large amount of U.S. currency which was banded together by rubber bands inside RIJO's bags.   TFO/Sgt. Kenagy advised me of his discovery and I asked RIJO how much money he was travelling with.   RIJO informed me that he was travelling with over $100,000.00.

21.    HIT investigators conducted criminal history queries on both RIJO and SIMON.

22.    The criminal history query conducted on RIJO indicated he had been arrested and convicted in Tennessee in 2014 for possessing, selling, delivering and manufacturing a schedule VI controlled substance. RIJO also has multiple drug arrests in Florida.   In 2008, RIJO was arrested for possession of marijuana with intent to sell and deliver. In 2010, RIJO was arrested and convicted of possessing more than 20 grams of marijuana.   In 2011, RIJO was arrested and convicted of possessing drug paraphernalia.   In 2014, RIJO was arrested for trafficking marijuana as well as producing and cultivating marijuana.   He was convicted of conspiracy to sell and deliver marijuana.

23.    The criminal history query conducted on SIMON indicated he had several drug related arrests in Florida. SIMON was arrested and convicted in Florida in 2008 for possessing drug paraphernalia and possessing more than 20 grams of marijuana. In 2010, SIMON was arrested and convicted for possessing drug paraphernalia and under 20 grams of marijuana.   SIMON was also arrested in 2010 for possession of marijuana with intent to deliver.   In 2013, SIMON was arrested for possession of marijuana with intent to deliver, possession of over 20 grams of marijuana and possession of drug paraphernalia. In 2014, SIMON was arrested and convicted of

possession more than 20 grams of marijuana, as well as possessing marijuana with the intent to sell.

24.     SIMON also has multiple arrests in Georgia. In 2005, SIMON was arrested for purchase, possession, manufacture, distribution or sell of marijuana. In 2006, SIMON was arrested for possession of less than one ounce of marijuana.

25.     After this discovery, RIJO and SIMON were detained and walked to the Amtrak Police office along with their bags. I walked with SIMON and mirandized him, to which he responded "yes" to understanding his rights.

26.     Once at the office, I sat in an interview room with RIJO and mirandized him, to which he answered "yes" to understanding his rights.

27.     During my interview with RIJO, he informed that he was travelling to Medford, Oregon, to purchase property.  He said both he and SIMON intended to invest in property in Oregon, but they had not yet decided what kind of property they were going to invest in.  RIJO told me that they were meeting with a real estate agent to identify and purchase property.  RIJO further informed me that he had been to Portland once before, a month or two prior to this visit. RIJO explained to me that he is self-employed and that he sells cars and jewelry.  He also said that he is renovating a house in Florida that he had bought as an investment.

28.     I asked RIJO about his income.  RIJO stated he has earned approximately $15,000.00 a year for each of the last two years.  He added that he lives with his girlfriend and three children in a house that they rent for $2,000.00 a month.  RIJO added that his girlfriend makes approximately $7,000.00 a month before taxes.

29.     I asked RIJO where the U.S. currency discovered in his bags came from, and he said that he had won $150,000.00 about two to three months ago at a casino near Sacramento,

**Declaration of Christopher Devlin**                              **EXHIBIT A   Page 8**

California.   RIJO could not remember the name of the casino. I asked him how he won that much money at the casino, to which he said he won it from playing "an Asian game."   He said it was a table game, but he could not remember what it was called.   I asked him if there was any record of his winnings and he said there was not.   He said that they paid him out mostly in cash, but the casino did write him a check for $30,000, which he stated he deposited into his bank account. RIJO further stated that when the casino paid him out, he was not required by them to fill out any tax forms.

30.    I asked him who he banks with.   RIJO told me he has accounts with Wells Fargo and Bank of America in Florida.   I also asked RIJO if the U.S. currency discovered in his bags was withdrawn from his bank accounts. RIJO explained that all of it was with the exception of $30,000.00.   RIJO further explained that the $30,000.00 was already in cash and was from his casino winnings.   RIJO stated that approximately two months ago he withdrew the $30,000.00 from his bank after he deposited the check from the casino.

31.    I further asked RIJO if he could access his bank statements from his cell phone to prove or disprove any of his story.   RIJO told me that he could not and RIJO further stated that he did not want to give me consent to search his phones.

32.    I asked him about his travel on Amtrak.   RIJO told me that he and SIMON purchased one-way tickets on Friday, May 11, 2018 from Florida.   RIJO explained that it was the first time he has ever been on Amtrak.   I asked him why he traveled for four days via Amtrak instead of flying. RIJO stated "I don't really like flying". I asked him how he travelled in the past and he added "well now that I've been on Amtrak."

33.    Portland Police Officer Ryan Derry interviewed SIMON while I interviewed RIJO. Officer Derry briefed me and stated that SIMON was being aloof regarding the purpose of his trip

**Declaration of Christopher Devlin**                                **EXHIBIT A    Page 9**

and where the U.S. currency came from.   Officer Derry told me that SIMON told him that he travelled to Oregon to purchase property.   SIMON did not provide specifics as to where or what type of property he intended to purchase.   Officer Derry also relayed to me that SIMON informed him that the U.S. currency located in his bag was from gambling winnings he earned in October 2017 at a casino located in Napa Valley, California.

34.   I joined Officer Derry as he continued to speak with SIMON.   I asked SIMON if he could access his bank statements from his cell phone to prove or disprove any of his story. SIMON said yes and showed us his online bank statements, where I was able to observe large deposits followed by large withdrawals from his bank account.   SIMON continued to be vague in his answers.   I asked SIMON if he had ever been to Portland.   SIMON said he had never been to Portland before.   He said he had only been to Southern Oregon.

35.   Both RIJO and SIMON were transported downtown to the Portland Police Bureau's Drugs and Vice Division (DVD) office for further processing.

36.   I was made aware that law enforcement database queries were conducted by investigators, which revealed that that on April 22, 2018, SIMON had approximately $130,000.00 in U.S. currency seized from him at the Orlando International Airport.

37.   I was able to speak to HSI Orlando Special Agent Nestor Perez regarding this seizure who informed me about the following facts.

38.   On Sunday, April 22, 2018, SIMON was ticketed to fly on American Airlines flight #473 from Orlando, Florida to Los Angeles, California, at 5:25 am. Prior to his flight, the Transportation Security Administration (TSA) discovered a large amount of bundled U.S. currency in SIMON's carry-on bag as he went through the screening process at the security checkpoint. The information was passed on to law enforcement who made contact with SIMON.

**Declaration of Christopher Devlin**                                   **EXHIBIT A     Page 10**

39.    SIMON had voluntarily agreed to speak with SA Perez and HSI TFO Alleyne at the Orlando Police Department substation located within Orlando International Airport.    Prior to questioning SIMON, SA Perez identified himself to SIMON via official credentials and explained to SIMON that he was free to leave at any time.    SIMON chose to remain at the substation to talk to agents about the money.

40.    During the interview, SIMON told agents that he was a jeweler and the purpose of his travel was to purchase jewelry in California. He stated that he planned to travel throughout California searching for "what I'm looking for."    However, SIMON never provided SA Perez with specifics as to what he was looking for.    When asked why he would travel across the country to buy jewelry, SIMON stated, "California has a lot of stuff going on."

41.    SIMON then told agents that he purchased his plane ticket the day before and he was traveling with approximately $130,000.00, which came from a variety of sources. Specifically, SIMON stated $40,000.00 came from jewelry he pawned in Osceola County, Florida on April 20, 2018, $12,000.00 came from an insurance settlement from a check issued by attorney Dan Newlin, and approximately $80,000.00 came from a safe he had at his house.

42.    SIMON stated he kept the money at his residence as opposed to a bank "because if I need to use it, I use it."    SIMON then stated that he won $180,000.00-200,000.00 at a casino six months prior (in approximately October 2017).    He was unsure of the casino's name, but believed the casino was named "Napa Hill" or "Napa Valley."

43.    SIMON indicated that he had a business named Diamonds Gold Rolex Inc., which was incorporated in Florida, and that he had operated the business for two years. When asked about his jewelry inventory, SIMON stated he did not have any because he had pawned it all.

**Declaration of Christopher Devlin**                                        **EXHIBIT A    Page 11**

44.     When asked about his arrest history, SA Perez relayed that SIMON stated that he had only been arrested on minor marijuana possession charges, stating the arrests were only for "grams."

45.     SA Perez informed me that SIMON happened to be traveling with his 2017 1040 Individual Income Tax Return, which showed his total income for 2017 as $69,662.00. When asked where his casino winnings had been documented on the tax form, SIMON stated they had not been filed yet.

46.     SA Perez also informed me that a preliminary review of SIMON's criminal history revealed multiple arrests for marijuana possession, including Possession with Intent to Sell Marijuana, which were not solely "minor" marijuana possession charges as indicated by SIMON.

47.     I was also informed that upon examination of SIMON's carry-on bag containing the currency, both SA Perez and TFO Alleyne smelled the odor of marijuana emanating from the bag.

48.     Once they removed the money from the carry-on bag, SA Perez observed a green leafy substance at the bottom of the bag which he identified as marijuana.   Agents explained what they found to SIMON, who then asked to see the bag.   Upon looking in the bag, SIMON identified the green leafy substance as "crumbs" and stated he smokes marijuana.

49.     SA Perez also informed me that he had inspected the money and observed that most of the U.S currency was wrapped with money bands, and that none of the bands had markings consistent with the money having been disbursed by a financial institution. SA Perez questioned SIMON about the bands.   SIMON stated he had wrapped the money in bands because otherwise the money did not look proper.

**Declaration of Christopher Devlin**                                              **EXHIBIT A    Page 12**

50.    SA Perez informed SIMON that a properly trained narcotics-detection dog positively alerted to the presence of the odor of narcotics emanating from the U.S. currency. Officers then seized the U.S. currency.

51.    I spoke with SIMON again in an interview room at the Drugs and Vice Division office.  I again asked SIMON where he got the U.S. currency located in his bag at the Amtrak Station, and SIMON said it came from his casino winnings.  I asked SIMON if he had $130,000.00 seized from him at an airport in Orlando less than one month ago.   SIMON said yes.  I pressed further, and asked SIMON how could this money come from his casino winnings when a lot of his casino winnings were already seized at the Orlando airport.   SIMON replied that he has other sources of income and that only a portion the casino winnings was seized in Orlando.

52.    During the search of SIMON'S bag, a hotel business card from Briarwood Suites Hotel located at 7740 SE Powell Blvd, Portland, Oregon was located.

53.    In total, TFOs seized $107,460.00 from SIMON and $166,530.00 from RIJO, for a total of $273,990.00.

54.    On May 16, 2018, I obtained a search warrant signed by Multnomah County District Court Judge Bushong to search SIMON and RIJO'S cell phones.

55.    In reviewing SIMON'S cell phone, I observed dozens of pictures, texts, and notes indicating he has been involved in trafficking marijuana since 2015.   Multiple videos and photos showed large amounts of marijuana in turkey oven bags and vacuum sealed.   There were also multiple images showing large amounts of U.S. currency.   In one image, there was U.S. currency next to a money counter with a vacuum sealer in the background.   There were also several images of money wires where money was being sent from California to Florida.   I also observed several bank slips involving the deposit of cash.   One image showed a Wells Fargo deposit slip for $4,950.

**Declaration of Christopher Devlin**                              **EXHIBIT A    Page 13**

The slip showed that all the bills were $20s except for one $50 bill. The slip also indicated that the bills were both "loose currency" and "strapped currency."

56.    SIMON'S cell phone images also showed several packages being shipped from California to Florida.   This is consistent with marijuana being shipped from California to Florida. A photo of a handwritten drug ledger appeared in one image, showing names associated with weights and types of marijuana.

57.    In the Notes section of SIMON'S cell phone, there were dozens of notes containing addresses, tracking numbers, and marijuana strands with weights and amounts.   One example of such a note looks like this:

> 5 bubba kush 1200 = 6000 5 og 1250 = 6250 10 blue city = 12000 7 Des 1200 = 8400 3 dog walker 1050 = 3150 2 wtc 1250 = 2500 5 phc 1250 = 6250 10 green cookies 1150 = 11500 5 mixed samples 1300 = 15 bubba kush 1200 = 18000 3 glue tech 1250 3 Durban 1250 2 Cali no name 1 J 1400 2 purple punch 1400 1 confidential Kush 1400 8 OGD 1400 5 GG 1400 6 P98 Bubba 1200 13 X-OG 1400 8 Dog walk 1300

58.    I know from my training and experience that "Bubba Kush," "OG," "Cali No Name," and "Blue City" are marijuana strands.   Throughout my review of SIMON's cell phone, it was apparent that SIMON was coordinating the sale of these strands to multiple individuals dating back to 2015.

59.    I also reviewed text and SMS messages between SIMON and various individuals. I recognized from my training and experience that the contents of these messages pertained to the sale of marijuana.   One such example is as follows:

04/17/2018

SIMON:                    Happy?

**Declaration of Christopher Devlin**                    **EXHIBIT A    Page 14**

Crystal C:                           Yea i think it's looks n smells good

Crystal C:                           Just sent my man pics

Crystal C:                           Hey

5/6/2018

Crystal C:                           U got anything that blows good

                                     For super cheap? Someone out here selling shut for hella

                                     cheap so lost a few costumers due to that So I'm trying to

                                     get something a lil cheaper So i can match prices n get

                                     them back over on my side

Crystal C:                           Lmk

SIMON:                               Fire always kills cheap

Crystal C:                           Yea but they going for that cheap shit right now

                                     Maybe like half cheap so i can match the prices out there n

                                     not kill my profit to much

SIMON:                               I got sumin 4 him

60.     I also observed this conversation between SIMON and "Quana" :

04/10/2018

QUANA:                               Lodi, lemon haze, agent orange. Like 1000 to me.

                                     My other homies haven't got back to me yet

QUANA:                               If you days heads up before you come

04/12/2018

 SIMON:                              Ok

**Declaration of Christopher Devlin**                              **EXHIBIT A    Page 15**

QUANA:                My boys were wondering was good since you told them

                      one week

4/16/2018

SIMON:                My package had to sit over the weekend it comes in

                      tomorrow

QUANA:                Word

                      Call me when your up

4/23/2018

SIMON:                Happy birthday btw

4/29/2018

QUANA:                Thank you

SIMON:                I would have stopped by but just wanted to finish up this

                      business. Well I'm in Medford for the night I have a flight

                      at 7

5/1/2018

QUANA:                To where?

                      I thought you already dipped ou

                      Out

                      To here?

SIMON:                I did

                      But I came back lookin at property

QUANA:                    Where are you looking?

                          If your doing indoor then why you looking down south.

                          You should look closer to Eugene

SIMON:                    It doesn't matter

61.    From my training and experience, I believe that this conversation shows Quana stating that she can obtain pound quantities of the marijuana strains "Lodi," "lemon haze," and "agent orange" for $1000.00 per pound.   I also believe toward the end of the conversation SIMON states that he is looking for a property to purchase in Oregon to grow marijuana and Quana is giving him advice on where to purchase that property.

62.    After viewing RIJO'S cell phone, I observed dozens of pictures, texts, and notes indicating he is involved in trafficking marijuana dating back to 2016.   Multiple videos and photos showed large amounts of marijuana. There were also images showing large amounts of U.S. currency.  RIJO'S phones had multiple messages indicating money was being transferred and deposited into his Wells Fargo bank account.   RIJO even provided his Wells Fargo bank account number in one message.

63.    In the Notes section of RIJO'S phone, I observed dozens of notes containing addresses, marijuana strands, and weights as well as amounts owed.

64.    For example, I located a note on RIJO's cell phone which was created on April 11, 2018, and was last modified on May 14, 2018.   The note's contents are as follows:

4/11

**GA**

Bcd 1/2 1100✓,

Jovan Bcd 1/2 1200✓

**Declaration of Christopher Devlin**                                **EXHIBIT A    Page 17**

_____-

4/12

**Gold**

1 og   2000 paid 2000paid2500

1 bub 2000

1 bcd 2000

1000os

**Teck**

1phc 1900 paid 1000 os 2800 ✓

1/2 gc.   1900

1/2 og.   ↑

1/2 gc. 1900

1/2.     ↑

1 Og 1900

**Max boy**

1/2 bcd 1100✓

**Diego**

1 OG 2100 paid 6000 os 300✓

1 phc 2100✓

1 wtc 2100✓

_____

**Declaration of Christopher Devlin**                    **EXHIBIT A    Page 18**

4/13

**Mora boy**

2 Bubba paid 4100 paid 2500paid2500os650✔

1 gc

1 bcd

1 des

————-

4/15

**Drama**

6-   2000 =12000✔

1/2-   1100✔

Still os 600

**Georgy**

1 dog 1900. Paid 1000paid1050paid1400os2000paid1500os500

1 xo og 1900

1/2 purp 950

2-moon rock 700

————-

4/17

**Chuck**

1/2 gg 1100 paid 600✔

4/19

**Declaration of Christopher Devlin**                              **EXHIBIT A    Page 19**

**Skee**

Q gg. 550 ✓

**Max**

Q gc. 1100✓

**Diago**

1 gg -2100✓

_____

4/20

**Nado**

Qp gg 550✓

**Tech**

1-    1900✓

**T**

7-    1850✓

2-    1500✓

**Rome**

1 gg. 2100    Paid

150paid✓

1 xo og 2150✓

1 dog.    1900✓

1/2 punch 1100✓

**Diego**

1 og 2100✔

**Drama**

2-2000✔

1/2 1000paid 500os 1100. Was 700 but os 600

———-

4/24

**Skee**

1 bub-2000 ✔

**Ga**

1/2 1100

**Drama**

1-   2000✔

_____

**Samy**

2-1900 paid 3000os 800✔

**Tech**

1-1900✔

1/2 850✔

**Nado**

Qp-   550✔

**Wb**

7-1850 paid 3000 os 9950✓

**Nado**

Qp-550✓

**Skee**

Qp-550✓

**Nando**

1/2-1100✓

**Rose**

1-2000✓

1/2-1000✓

**Os Tampa**

2-2200✓

**Tech**

1-1900✓

1/2-950✓

**Rome**

1/2-?

Q-500✓

**Jovan**

Qp-500

**Mora boy**

3-1950 paid 650 paid 700 gave back 3 and a 1/2

3-1900

**Rome**

1-2000✓

1-1900✓

1/2-950✓

1/2-1050✓

**Max**

1/2-1100

**Rozy**

1-2000✓

**Teddy**

1-2000 paid 1000✓

**Skee**

1/2-1100 paid 550

**Rome**

1/2-1000 paid1125 os4000

Q-525

1-1800

1-1800

**Declaration of Christopher Devlin**                    **EXHIBIT A    Page 23**

**Drama**

2-2000 paid3000

1/2-1000

**Samy**

1-1900

65.    I recognized that this note was a pay/owe sheet, which lists quantities of what I suspect to be marijuana and amounts owed by each individual who is named.   I recognized the quantities listed to represent quantities commonly used in measuring marijuana.   For example, 2= two pounds, 1= one pound, ½ = one half pound, and QP= one quarter pound.   I also believe from my training and experience that the use of "os" is meant to mean "owes."

66.    I further identified the names "DIEGO", "DRAMA" and "WB" as names saved as contacts in RIJO's phone.   I also observed the forensically recovered text message conversations between RIJO and these individuals, and based on my training and experience, recognized their content to primarily pertain to the sale of marijuana to these individuals.   Examples of these conversations are as follows:

Conversation with DIEGO

| | |
|---|---|
| 4/19/2018 1:35:22 PM | DIEGO: Let me get a sample a g each to try ? |
| | RIJO:   Ok |
| 4/19/2018 1:44:16 PM | DIEGO: Lmk |
| | RIJO:   Fosho |
| 4/20/2018 7:09:53 PM | DIEGO: I got 2k |

| 4/20/2018 7:09:55 PM | DIEGO: Ima owe yu 100 |
| | RIJO:   Ok cool g |
| | RIJO:   About to pull up |
| 4/20/2018 7:37:40 PM | DIEGO: Ok |
| 4/20/2018 9:29:53 PM | DIEGO: Yo |
| | RIJO:   What's good g |
| 4/20/2018 9:40:45 PM | DIEGO: What's that bud called yu brought me the 17 gs |
| 4/20/2018 9:40:45 PM | DIEGO: ? |
| | RIJO:   Green crack |
| 4/20/2018 9:41:35 PM | DIEGO: Ight |
| 4/21/2018 2:10:36 PM | DIEGO: I need 2 jars |

67.    Based on my training and experience, I know "that bud" refers to marijuana and "17gs" refers to 17 grams.  In this message RIJO also identifies "Green crack" as a strain of marijuana.

68.    Another example of a text conversation is as follows:

Conversation with DRAMA

| 4/20/2018 5:37:31 PM | DRAMA: | Cuz said u still got us |
| | RIJO: | Yeah |
| 4/22/2018 9:21:22 AM | DRAMA: | Wats da other flavors |
| 4/22/2018 9:21:22 AM | DRAMA: | I want Og, Green crack, huckleberry cookies |
| | RIJO: | Yoyo |
| 4/23/2018 3:35:53 PM | DRAMA: | Cuz said da blue city diesel was short a zip |

| 5/1/2018 3:15:29 PM | DRAMA: | Wassup wit da moonrock |
| | RIJO: | Soon boss |
| 5/1/2018 3:19:43 PM | DRAMA: | Cuz said let him know he want 2 |
| | RIJO: | Ok bet fosho |

69.     Based on my training and experience, I know "Zip" refers to an ounce of marijuana. In this conversation, DRAMA states "Cuz" informed him that the marijuana strain "Blue City Diesel" was short an ounce and that "Cuz" wants two pounds of the marijuana strain "moonrock."

70.     Another example of a text conversation is as follows:

Conversation with WB

| 4/29/2018 10:11:34 AM | WB: | I'm going thru gate now |
| | RIJO: | How much are you giving him |
| 4/29/2018 10:28:59 AM | WB: | 3 stacks |
| 4/29/2018 10:28:59 AM | WB: | I took 7 packs |
| | RIJO: | Ok cool |
| 4/29/2018 10:31:34 AM | WB: | There was one in there I didnt want 2 of |
| | RIJO: | Which one |
| 4/29/2018 10:32:44 AM | WB: | Gg4 |
| | RIJO: | There was only one of those |
| 4/29/2018 10:36:06 AM | WB: | Both was labeled gg4 so I left one idk check it out when you get back I took one of em |
| | RIJO: | Ok cool |
| 4/29/2018 10:42:56 AM | WB: | Ty sir |

**Declaration of Christopher Devlin**                    **EXHIBIT A    Page 26**

| 5/5/2018 9:03:39 AM | WB: | What's up man |
| | RIJO: | Nothing much bro what's going on |
| 5/5/2018 9:04:33 AM | WB: | Where you at |
| 5/5/2018 9:04:33 AM | WB: | Want me to deposit Monday at bank? |
| | RIJO: | If you're not on this side yeah sounds good |
| 5/5/2018 9:09:43 AM | WB: | I have 5 stacks for you should I deposit or bring full 9950 with me Saturday next week to you |
| | RIJO: | Its cool go ahead and deposit the 5 and I'll collect the rest later |
| 5/5/2018 10:12:44 AM | WB: | Ok Monday morning |
| 5/5/2018 10:12:44 AM | WB: | Send info |
| | RIJO: | Ok |
| | RIJO: | "Wells Fargo Steven Rijo XXXX790" |

71.    Based on my training and experience, I know "Gg4" refers to a marijuana strain. In this conversation, WB took possession of 7 packs of marijuana.   WB also asks RIJO to send information on where to deposit cash at the bank.   RIJO then gave WB his Wells Fargo bank account number.

72.    On May 22, 2018, I spoke with an employee at the Briarwood Suites Hotel located at 7740 SE Powell Blvd, Portland, Oregon.   I learned that SIMON had been a guest at the hotel for 2 nights in April 2018, starting on April 26, 2018.

73.    I also reviewed flight information regarding airline travel for SIMON between January 1, 2017 and May 16, 2018.   Records show that SIMON made several trips every month during these dates.   SIMON'S travels included several trips to the west coast including San

**Declaration of Christopher Devlin**                                    **EXHIBIT A    Page 27**

Francisco, Seattle, Los Angeles, and Portland. There were at least seven (7) flights showing SIMON was in Portland, Oregon. For example, on March 7, 2017, SIMON flew from Atlanta to Portland, and then flew from Portland to San Jose, California on March 9, 2017. Records also showed that SIMON and RIJO flew from Orlando to Los Angeles on May 16, 2017. This shows SIMON was lying when he told me that he had never been to Portland, Oregon.

74. On August 13, 2018, I reviewed information from Napa Valley Casino - B.V.K. Gaming Inc. regarding SIMON and RIJO'S casino transactions. I also spoke with the casino's General Manager, who told me that the winnings SIMON and RIJO reported came from a game called Baccarat.

75. I learned that SIMON did in fact win a total of $187,455. SIMON gambled on October 25–31, 2017 and on February 1, 2017. A breakdown of SIMON's gambling on those dates is as follows:

| Date | Buy Ins | Cash Out | Check |
|---|---|---|---|
| 10/25/2017 | | 50000 | |
| 10/26/2017 | 29700 | 80025 | |
| 10/27/2018 | 36800 | 100000 | |
| 10/28/2017 | 96000 | 100000 | |
| 10/29/2017 | 50000 | 100000 | |
| 10/30/2017 | 42300 | 20230 | 20000 |
| 10/31/2017 | 16000 | | |
| 2/1/2018 | 16000 | 4000 | |
| Totals | 286800 | 454255 | 20000 |
| | | Difference | 187455 |

76. I learned that RIJO did in fact win a total of $23,235. RIJO gambled on October 26–31, 2017. A breakdown of RIJO's gambling those dates is as follows:

**Declaration of Christopher Devlin**   **EXHIBIT A   Page 28**

| Date | Buy-In | Cash-Out | Checks |
|------|--------|----------|--------|
| 10/26/2017 | 4000 | 7000 | |
| 10/27/2017 | 11000 | 30260 | |
| 10/28/2017 | 35000 | 50300 | |
| 10/29/2017 | 36000 | 0 | |
| 10/30/2017 | 23000 | 24675 | 30000 |
| 10/31/2017 | 10000 | 0 | |
| Totals | 119000 | 142235 | |
| | Total Difference | | 23235 |

77.    These records show that RIJO did not win $150,000 like he originally told me.

78.    I also reviewed bank records from Bank of America regarding accounts SIMON maintained under account XXXX272 and XXXX357. I observed that from November 2016 through December 2017, there were third-party cash deposits to SIMON'S account that had been observed to have the odor of marijuana. I observed that the deposit activity took place in numerous locations throughout the country, including Florida, California, North Carolina, and New York. The deposit activity consisted of 107 cash deposits totaling $102,116.   In conjunction with the cash deposits, there were structured cash withdrawals where on some occasions, deposits and withdrawals were made on the same day at separate locations.   I believe SIMON made these structured transactions to avoid currency reporting requirements.   I also noted that in one instance, a bank employee indicated that SIMON smelled like marijuana.

79.    I reviewed bank records from Wells Fargo and Bank of America regarding accounts RIJO maintained. While conducting my review of RIJO's Wells Fargo account XXXX790, I observed that from May 2017 to November 2017, account XXXX790 received 45 cash deposits totaling $34,621.00 from locations in Florida, Indiana, and North Carolina.   I also observed that in conjunction with the cash deposits, there were structured cash withdrawals, where on some occasions large deposits and withdrawals were made on the same day.

**Declaration of Christopher Devlin**                                        **EXHIBIT A    Page 29**

80.     During my review of RIJO's Bank of America account XXXX395 and SIMON's Bank of America accounts XXXX272 and XXXX357, I observed that cash deposits occurred in all three (3) accounts from May 2017 through March 6, 2018.  Specifically, account XXXX395 received  $18,400.00,  account  XXXX357  received  $105,910.00,  and  XXXX272  received $20,215.00 at branches and ATMs in California, Florida, and New York. The cash deposits amounted to just below the reporting limits, and sometimes were made on consecutive days in amounts that, when added together, would have exceeded the reporting limits.  Furthermore, I observed that the deposits were conducted in geographically diverse locations which suggests two or more people working together.

81.     In addition to the cash deposits, there was 19 structured cash withdrawals totaling $155,250.00.  These withdrawals were in the form of cash and the activity occurred at financial centers in Los Angeles, CA; Merced, CA; Sacramento, CA; Kissimmee, FL; and Orlando, FL; and ATMs in Anaheim, CA; and Kissimmee, FL. The withdrawals occurred between May 26, 2017 and February 18, 2018, and were taken out of SIMON's accounts XXXX357 ($87,000.00) and XXXX272 ($4,500.00), and RIJO's account XXXX395 ($63,750.00).

## CONCLUSION

82.     Based on the foregoing information, I have probable cause to believe, and do believe, that the $273,990.00 in U.S. currency seized from Michael SIMON and Steven RIJO is subject to forfeiture pursuant to 21 U.S.C. § 881(a)(6), as moneys furnished or intended to be furnished by any person in exchange for a controlled substance, proceeds traceable to such an exchange, or moneys used or intended to be used to facilitate violations of 21 U.S.C. § 801, *et. seq.*

**Declaration of Christopher Devlin**                                      **EXHIBIT A    Page 30**

I declare under penalty of perjury that the forgoing is true and correct pursuant to 28 U.S.C.

§ 1746.

Executed this 19th day of February, 2019.

*s/ Christopher Devlin*
Christopher Devlin
Task Force Officer
Homeland Security Investigations

**Declaration of Christopher Devlin**                                    **EXHIBIT A    Page 31**

JS 44   (Rev. 12/07)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law,  except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a)  PLAINTIFFS

## DEFENDANTS

**(b)**   County of Residence of First Listed Plaintiff _____
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant _____
(IN U.S. PLAINTIFF CASES ONLY)

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED.

**(c)**   Attorney's (Firm Name, Address, and Telephone Number)

Attorneys (If Known)

## II.  BASIS OF JURISDICTION   (Place an "X" in One Box Only)

☐ 1   U.S. Government
Plaintiff

☐ 3   Federal Question
(U.S. Government Not a Party)

☐ 2   U.S. Government
Defendant

☐ 4   Diversity
(Indicate Citizenship of Parties in Item III)

## III.  CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only) and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV.  NATURE OF SUIT   (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury - Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | | ☐ 490 Cable/Sat TV |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☐ 160 Stockholders' Suits | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 190 Other Contract | | | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 195 Contract Product Liability | | | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 791 Empl. Ret. Inc. Security Act | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus:** | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | | | |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | **IMMIGRATION** | | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | ☐ 462 Naturalization Application | | |
| | ☐ 440 Other Civil Rights | ☐ 555 Prison Condition | ☐ 463 Habeas Corpus - Alien Detainee | | ☐ 950 Constitutionality of State Statutes |
| | | | ☐ 465 Other Immigration Actions | | |

## V.  ORIGIN   (Place an "X" in One Box Only)

☐ 1   Original Proceeding
☐ 2   Removed from State Court
☐ 3   Remanded from Appellate Court
☐ 4   Reinstated or Reopened
☐ 5   Transferred from another district (specify)
☐ 6   Multidistrict Litigation
☐ 7   Appeal to District Judge from Magistrate Judgment

## VI.  CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing  (Do not cite jurisdictional statutes unless diversity):

Brief description of cause:

## VII.  REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☐ Yes   ☐ No

## VIII.  RELATED CASE(S) IF ANY

(See instructions):

JUDGE

DOCKET NUMBER

DATE

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____